IN THE UNITED STATES COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Houston Division

| | | |
|---|---|---|
| Maurice S. Jordan p/k/a "Kenoe" | § | |
|     Plaintiff | § | |
| v. | § | CIVIL ACTION NO.  4:06-CV-01673 |
| 1. Sony BMG Music | § | |
|     Entertainment, Inc. (As Successor in | § | |
|     Interest For Sony Music), Individually | § | |
|     and d/b/a Columbia Records and | § | |
|     Loud Records | § | |
| 2. Wesley Eric Weston P/K/A "Lil Flip", | § | |
| 3. Suckafree Records, Inc., | § | |
| 4. Lucky Publishing Company | § | |
| 5. Estelle Douglas Hobbs, Jr. a/k/a "Hump" | § | |
|     and, | § | |
| 6. Hobbs Publishing Company | § | |
|     Defendants | § | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT
SONY BMG MUSIC'S MOTION FOR SUMMARY JUDGMENT**

D. Scott Hemingway
Attorney In Charge
State Bar # 09407880
Eugenia S. Hansen
HEMINGWAY & HANSEN, LLP
1717 Main Street, Suite 2500
Dallas, Texas  75201
Telephone:      (214) 292-8301
Facsimile:      (214) 739-5209

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ………………………………………………… 1

II.     STATEMENT OF FACTS … ………………………………………..4

        A. Complete Contract Documentation Between the Defendants………….4

        B. Ownership and  Copyright Rights.……………………………………..7

        C. The Accused Works on the Accused Albums …………………… …......9

        D. Communications and Tactics of Sony BMG ……………….. ……......12

                1.  After Execution of the Contracts, The Plaintiff
                    Request for Information from Sony BMG………………….12

                2.  After Execution of the Contracts, Sony BMG Initially
                    Promises to Pay Plaintiff for 50% Ownership Share ………13

                3.  Then, Sony BMG Claims, For the First Time,
                    Discrepancies Exist in the Accounting of Shares ………….13

                4.  Then, Sony BMG Reduces Plaintiff's Ownership
                    Share from 50% to a "Zero Rate," and refuses to
                    Respond to Subsequent Communication …….……………14

                5.  Sony BMG's Continued Stalling and Delay Tactics ………15

III.    ARGUMENT AND AUTHORITIES ……………………………….....15

        A. Sony BMG's is a Responsible Party for Payment under the
           Contract ………………………………………………………………...16

        B. Sony BMG Motion for Summary Judgment of No Copyright
           Infringement Should be Denied………………………………... …......18

        C. The Copyright Ownership and Accounting Requests Should
           Not Be Dismissed …………………………………………….……..22

                1.  Plaintiff Jordan and Sony BMG are Joint Owners
                    of the Final Songs Distributed from the Master

Recordings …………………………………………………...22

2. No Statute of Limitations Prevents the Plaintiff
from Seeking an Adjudication of Authorship
and an Accounting …………………………………………24

    a. Texas State Law Applies to the Accounting Claim …....24

    b. The Cause of Action Accrued on June 9, 2004,
with the Repudiation of Ownership by Sony BMG …....24

D. The Plaintiff's Fraud and Misrepresentation Claims Should
Not Be Dismissed …………………………………….………...27

E. The Plaintiff's Texas Theft Liability Act Claims Are Not
Preempted by the Copyright Act …………………………………….29

IV.   CONCLUSION …………………………………………………...........32

# TABLE OF AUTHORITIES

## CASES

*AAlmuhammed v. Lee,*
    202 F.3d 1227 (9th Cir. 2000) ……………………………………………25, 26

*Alcatel USA, Inc. v. DGI Techs., Inc.,*
    166 F.3d 772 (5th Cir. 1999) ……………………………………………..30

*Bridgeport Music, Inc. v. Dimension Films,*
    383 F. 3d 390 (6th Cir. 2004) ……………………………………….…..18

*Bridgeport Music, Inc. v. Dimension Films,*
    410 F.2d 792 (6th Cir. 2005) …………………………………………….19

*Bridgeport Music, Inc. v. Rhyme Syndicate Music,*
    376 F.3d 615 (6th Cir. 2004) …………………...…………………….20

*Coffel v. Stryker Corp.,*
    284 F.3d 625 (5th Cir. 2002) …………………………………………….28

*Costello Pub. Co. v. Rotelle,*
    670 F.2d 1035 (D.C. 1981)…………..………………………………….20

*Daboub v. Gibbons,*
    42 F. 3d 285 (5th Cir. 1995) …………………………………………….30

*Diamond v. Gillis,*
    357 F. Supp. 1003 (E.D. Mich. 2005) ……………..…………………….25

*Direct TV, Inc. v. Cantu,*
    2004 U.S. Dist. Lexis 22715 (W.D. Tex. 2004) …………………….…...…….30

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,*
    960 S.W. 2d 41 Tex. Sup. Ct. J. (Tex. 1998) ………………………...………28

*Goodman v. Lee,*
    78 F.3d 1007 (5th Cir. 1996) …………………………………………….24

*Harbor Software, Inc. v. Applied Systems, Inc.,*
    887 F. Supp. 86 (S.D.N.Y. 1995) ………..…………………………...…….31

*Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co., Inc.,*
    480 S.W. 2d 607(Tex. 1972)) ……….…………………………………....16

*Herald Square Music Co. v. Living Music, Inc.,*
   1978 U.S. Dist. Lexis 14050 (S.D.N.Y. 1978) …………………………………20

*Kane v. NACE Int'l,*
   117 F. Supp. 2d 592 (S.D. Tex. 2000) …………………………………………..31

*Makedwde Pub. Co. v. Johnson,*
   37 F.3d 180 (5th Cir. 1994) …………………………………………………......20

*Miller Music v. Sony/ ATV Publishing,*
   477 F.3d 383 (6th Cir. 2007) …………………………………………………....26

*Railroad Mgmt. Co. v. CFS Louisiana Midstream Co.,*
   428 F. 3d 214 (5th Cir. 2005) ……………………………………..………………16

*Richie v. Williams,*
   395 F.3d 283 (6th Cir. 2005) …………………………………………………..25

*Stewart v. Abend,*
   495 U.S. 207 (1990) ………...………………………………………………....18

*Schoenberg v. Shapolsky Publishers, Inc,*
   971 F.2d 926 (2nd Cir. 1992) …………………………………………………20

*Weber v. Geffen Records, Inc.,*
   63 F. Supp. 2d 458 (S.D.N.Y. 1999) …………………………………………20

*Zuill v. Shanahan,*
   80 F. 3d 1366 (9th Cir. 1996) …………………………………………………25

*Zupano v. Quinn*
   2006 N.Y. Lexis 196 (Ct. App. N.Y. Feb. 21, 2006) ……………………………20

## STATUTES

17 U.S.C. §§ 106, 301, 501 …… ...………………………………………………...18, 29, 30

Tex. Civ. Prac. & Rem. Code §§ 134.001-005 § 16.051………………..……....………24, 30

## I.   INTRODUCTION

Under the 2002 Agreements between Suckafree Records and Sony BMG, Sony BMG became the "agent" for Suckafree Records responsible for payment of producer royalties and copyright license fees.  As part of their Agreements, Sony BMG agreed to distribute and sell the accused albums, and Sony BMG collected the revenue from the sales of the Suckafree Records albums. From this revenue, Sony BMG was Suckafree Records' agent responsible for paying the copyright holders and producers on the albums – such as the Plaintiff Maurice Jordan.  Sony BMG's Summary Judgment briefing conspicuously omitted the complete contractual documentation that clearly establishes this "agency" relationship, supports the Plaintiff's claims in this matter, and supports the denial of Sony BMG's motion for summary judgment.

During the course of their relationship, Suckafree Records provided Sony BMG with the album content for distribution, and Suckafree Records provided information identifying the relevant producers and copyright holders.  Sony BMG took that album content relating to the accused albums, entitled the *Undaground Legend* and *Suckafree Records and '713 Presents: Lil' Flip and the Undaground Legend*.  Sony BMG duplicated, distributed and sold it; and, Sony BMG has received approximately $10 million dollars in revenue.

Without a reasonable explanation, Sony BMG only paid certain music producers for their contribution to the accused albums.  One music producer, Edward Charles (pka "Kojak") was paid voluntarily by Sony BMG over $137,000 for his contribution of one musical melody to the accused albums.  Another music producer, Tommy Granville, was paid $167,500 by Sony BMG after a Southern District of Texas jury found that there was willful copyright infringement for one musical melody used on the *Undaground Legend* album.  The Plaintiff, Maurice Jordan,

made three times the contributions to the accused albums (at least) compared to these two paid producers.

While Sony BMG capriciously paid certain music producers on these albums, Sony BMG did not pay the other identified producers what was owed to them. Sony BMG was supposed to pay the Suckafree Records significant royalties and fees, but that did not happen. Suckafree Records was initially told it would be paid, but Suckafree Records has had to sue Sony BMG in Texas State Court and assert cross-claims in this action.

Sony BMG was obligated to pay Mr. Jordan as one of these other music producers on the accused albums, but those payments were not made. For two years after the album release, Sony BMG repeatedly told Mr. Jordan that he would be paid (by Sony BMG) for his contribution to the accused albums. Then, after Mr. Jordan's representatives repeatedly gave Sony BMG information requested to support the payments to Mr. Jordan (which was indicated to be sufficient by Sony BMG), Mr. Jordan was finally told two years after the album release that he was not owed any payments by Sony BMG.

The Plaintiff, Maurice Jordan (pka "Kenoe") contributed three different melodies and sound recordings on the accused albums, and Sony BMG conceded at the time that Sony BMG was the responsible party for paying him royalties and fees. Sony BMG has repeatedly told Mr. Jordan and his representatives that there was no dispute about whether Mr. Jordan contributed to these songs on the accused albums or the amount owed to him for these contributions. In 2002, Sony BMG even paid Mr. Jordan a $3000 retainer against the additional amounts owed to him, which Sony BMG concedes was just a "partial payment" for his music contributions.

This "initial" payment is important for four reasons – one, Sony BMG agrees that there is no dispute that Mr. Jordan contributed the identified music to the accused albums, two, Sony

2

BMG concedes that it is the responsible party for paying Mr. Jordan under the contracts with the other Defendants, three, Sony BMG concedes that additional money is owed to Mr. Jordan above and beyond this initial "retainer" payment, and four, Sony BMG concedes that Mr. Jordan is the person to whom royalties and fees for his contributions should be paid (as opposed to others).

Throughout its dealings with Mr. Jordan, Sony BMG continued to acknowledge that it was the responsible party under the contracts to pay Mr. Jordan or his representatives.  In 2006, Sony BMG acted in its role of responsible party to misdirect a $10,000 payment to a third party as part of a "scenario" to allegedly settle part of Mr. Jordan's dispute, even though this third party had no existing representation relationship with Mr. Jordan.  This "scenario" to pay money to this third party was the brain-child of Sony BMG's in-house counsel, and it is clearly described as a "scenario" in emails between the Sony BMG in-house counsel and this third party.

It was only after the present lawsuit was filed that Sony BMG, for the first time, made a claim that it was not the party responsible under the contracts to make the requested payments. That contract defense was never raised by Sony BMG prior to the lawsuit because it is contrary to everyone's understanding of the agreements between Mr. Jordan, Suckafree Records, Mr. Weston and Sony BMG.  Sony BMG should not be allowed to assert an unsupported contract defense for the first time in this matter after it signed Agreements that obligate Sony BMG to make the payments as Suckafree Records' agent.

Further, and regardless of any contractual relations between the parties, the joint ownership and copyright infringement claims are viable claims that should be addressed by a jury because genuine issues of material fact exist that make summary judgment improper. Further, there are genuine issues of material fact regarding the asserted Statute of Limitations defense based on Sony BMG's practice of "stalling" and "stone-walling" prospective claimants.

Opposition to Motion for
Summary Judgment

These delaying tactics used by Sony BMG include "stalling" the Plaintiff with false representations so as to delay a lawsuit filing, reduce damages, and support a Statute of Limitations defense.

These "delaying" tactics coincide with Sony BMG's litigation tactics of orchestrating a failed arbitration proceeding among the Defendants (resulting in a year and a half delay in these proceedings) and Sony BMG's repeated refusals to produce complete documentation in this matter. There are genuine issues of material fact as to whether Sony BMG's interactions with the Plaintiff Maurice Jordan and his representatives constitute fraud and/or negligent misrepresentation. Lastly, there is no preemption of the Texas Theft Liability Act, and any issues relating to the Statute of Limitations for that cause of action should be addressed to the jury.

## II.    STATEMENT OF FACTS

Defendant Sony BMG did not provide a statement of undisputed facts, and there is no authentication of the exhibits attached to the Sony BMG briefing. For the reasons stated herein, it is believed that disputed issues exist as to the completeness and authenticity of the documents provided by Sony BMG, and for that reason alone, this motion for summary judgment should be denied. Further, other disputed issues of material fact exist in this case that make this motion for summary judgment improper.

### A.    Complete Contract Documentation Between The Defendants

1.      On January 10, 2002, Sony BMG and Suckafree Records entered into an agency agreement which required Sony BMG to pay royalties and fees to the music content providers and copyright holders. *See Appendix I, Exhibit 1, Distribution Agency Agreement (SMU 01-379A.1(1)).* Suckafree Records' ("Owner") relationship to Sony BMG is set forth in Paragraph

4

19, which states "Sony is Owner's (Suckafree Records) agent for the purposes of the distribution described in this agreement." *Id.,  ¶19, p. 11.* Sony BMG's obligations to sell, distribute and collect revenue for Suckafree Records are set forth in Paragraph 11(c). *Id.,  ¶11, p. 6.*

2.      Sony BMG's obligations to pay copyright holders and music content providers their fees and royalties is set forth in Paragraph 4A, which states that Sony BMG must "make any payments to such music publishers and/or copyright proprietors as are required pursuant to such licenses." *Id., ¶4A, p. 3.* Sony BMG has not complied with its contractual obligations under this Agreement with respect to making payments to Mr. Jordan, a music producer, copyright holder, and third party beneficiary to this agency agreement.

3.      This Agency Agreement was incorporated by reference into the parties' signed Distribution Agreement, a complete copy of which was a public Trial Exhibit in the earlier *Granville v. Sony BMG* matter. *Appendix I, Exhibit 2, Distribution Agreement, ¶A.01 and A.02, p. 1 (this agreement and the "Initial Draft" constitute the agreement between the parties, and "Initial Draft" is* Exhibit 1 *and "identified by Sony's internal reference number as SMU 01-397A").* Sony BMG provided this Court with only a couple of pages from the parties' Distribution Agreement, but Sony BMG's briefing omitted any reference to the incorporated Agency Agreement cited above.

4.      This Agency Agreement has also been withheld from discovery by Sony BMG. In fact, Sony BMG has never produced a copy of the Agency Agreement (Exhibit 1) to the Plaintiff during discovery in this case or any prior legal matter involving Mr. Granville, Mr. Howard or Mr. Jordan. Three weeks ago, the Plaintiff's counsel received a copy of this Agency Agreement for the first time from a Suckafree Records pleading in a related action, *Joseph*

5

*Howard v. Sony BMG, Civil Action No. 4:06-CV-03133. See Appendix I, Exhibit 3, Suckafree Records Response to Motion for Summary Judgment, July 9, 2008 (exhibit A thereto).*

5.      Because Sony BMG has withheld this Agency Agreement from any document production, this Agency Agreement was withheld from Judge Ellison's consideration in Sony BMG's summary judgment motion in the *Howard* matter.   Sony BMG failure to mention this agreement prevented Judge Ellison from having the opportunity to review or analyze this Agency Agreement in making his Summary Judgment determination.

6.      The Suckafree Records pleading from in the *Howard* matter also included a Declaration from Suckafree Records President, Terry Hobbs, indicating that any money owed to music producers on the accused album "is owed by Sony, pursuant to our contractual agreements with Sony." *Appendix I, Exhibit 3, Id. (exhibit B thereto, Hobbs Decl., p. 2).* Ms. Hobbs' Declaration in this matter is attached at Appendix I, Exhibit 4, and another declaration from Ms. Hobbs in the *Howard* matter is attached at Appendix I, Exhibit 5.   These declarations clearly indicate that Sony BMG was contractually obligated to make fee, royalty and license payments to the music producers on the accused albums.

7.      The Production Services Agreement signed by Mr. Maurice Jordan with Suckafree Records and Weston for his production services is attached as Appendix I, Exhibit 6. The Suckafree Records' Authorization to Pay instructed its Agent, Sony BMG, to make payments to Mr. Jordan, which is attached as Appendix I, Exhibit 7.   While the Authorization to Pay includes language required by Sony BMG, the actions specified in this letter of instruction were accepted by Sony BMG, as an agent of Suckafree Records and for the benefit of Suckafree Records, Mr. Weston, and Mr. Jordan.

8.     Mr. Jordan has entered into a Production Services contract with Suckafree Records and Weston (*Exhibit 6*), and Suckafree Records has entered into an Agency Agreement with Sony BMG (*Exhibit 1*) which obligates Sony BMG to make payments to Mr. Jordan. Suckafree Records has instructed Sony BMG, as its agent, to make appropriate payments to Mr. Jordan pursuant to the Payment Authorization Contract at Exhibit 7.   Before asserting its litigation defense of "no contractual obligation," Sony readily accepted its role as the party responsible for paying third party producers and artists for their work on the accused album. As recently as two weeks ago, Sony BMG sent an email to various producers and representatives still recognizing its contractual obligations to make payments and "to clear up these matters so all payments can be processed by our (Sony BMG) royalty system." *Appendix I, Exhibit 8, July 14, 2008, Email from Kenneth Chan at Sony BMG to other producers (not to Mr. Jordan).*

**B.     Ownership and Copyright Rights**

9.     Mr. Weston (pka "Lil' Flip") transferred <u>his</u> ownership rights to the lyrical content on the Master Recordings to Suckafree Records pursuant to Paragraph 7.01 of the Agreement between Suckafree Records and Mr. Weston. *Appendix I, Exhibit 9, Suckafree Records/Weston Agreement, ¶7.01, p. 8 (if no work made for hire, recording shall be deemed transferred to SFRI (Suckafree Records) with all right, title and interest).*  This agreement did not transfer or affect Mr. Jordan's ownership rights to the copyrighted melody or the melody sound recording used on the three songs at issue, which have never been transferred or assigned.

10.     A complete copy of this Suckafree/Weston Agreement (Exhibit 9) was not produced by Sony BMG in discovery of this case, and a complete copy of this Agreement was only obtained by the Plaintiff from pleadings in the previous *Granville v. Sony BMG* matter. *Docket Entry No. 364, Post-Trial Motion for Enforcement, Part 1 and 2 to Exhibit A.*   The

7

Weston/Suckafree Records Agreement (Exhibit 9) retrieved from the Granville pleadings <u>differs</u> from the excerpted documents attached by Sony BMG to its Motion for Summary Judgment. *Compare, Agreement Appendix I, Exhibit 9, p. 1 to Agreement excerpts attached as Exhibit G to Sony BMG Motion for Summary Judgment, p. 1 (different page one, different pagination, different format, etc.).* A complete copy of this agreement from the prior pleadings in the *Granville* matter is attached to this pleading at Exhibit 9.

11.     After receiving Mr. Weston's transfer of rights, Suckafree Records transferred <u>its</u> ownership rights to the lyrical content on the Master Recordings to Sony BMG pursuant to Paragraph 7.01 of the Agreement between Suckafree Records and Sony BMG. *Appendix I, Exhibit 2, Suckafree Records/Sony BMG Agreement, ¶7.01, p. 16 (if no work made for hire, recording shall be deemed transferred to SFRI (Suckafree Records) with all right, title and interest).* This agreement did not transfer or affect Mr. Jordan's ownership rights to the copyrighted melody or the melody sound recording used on the three songs at issue, which have not been assigned or transferred.

12.     Mr. Jordan created the melodies for the accused songs, and pre-recorded the melody sound recordings for the accused songs before Mr. Weston added his lyrics. *See Appendix I, Exhibit 4, Hobbs Decl., ¶ 2-5, p. 1-2.* Mr. Jordan still owns the rights to the melody content on the Master Recordings used on the accused songs, and Sony BMG owns the other rights to the lyrical content of these sound recordings by virtue of the transferred rights documented in the above-identified agreements.

13.     There is no dispute that the actual sound recordings created by Mr. Jordan were used on the sound recordings that are found on the Master Recordings. *See Appendix I, Exhibit 5, Hobbs Decl., ¶ 2-5, p. 1-2.* Mr. Jordan and Sony BMG are now joint owners of the final

Opposition to Motion for
Summary Judgment

sound recordings and Master Recordings distributed by Sony BMG, which Sony BMG has claimed to be an owner of in its Copyright Filing. *Appendix II, Exhibit 11, Copyright Registration, Sony BMG is Copyright "Claimant" (claims to be copyright owner of songs that include the sound recordings created, recorded and owned by Mr. Jordan); Appendix, Exhibit 12, Copyright Office Publication, Claimant definition, p. 2.*

14.     Mr. Jordan, upon fixation of his melody in a tangible medium, obtained common law copyright rights to the melody he created and fixed in that tangible medium and he owned the rights to his sound recording of the melody. The melody is the series and sequence of musical notes, which no one disputes was created by Mr. Jordan. *Appendix I, Exhibit 4, Hobbs Decl., ¶ 2-5, p. 1-2.* Mr. Jordan registered his copyright rights to the melody by the Copyright Registration at *Appendix II, Exhibit 13,* which are separate and distinct rights from his ownership rights to the sound recordings and Master Recordings.

### C.     The Accused Works on the Accused Albums

15.     In late August 2002, Sony BMG distributed a Platinum-selling album entitled, *Undaground Legend,* one of the albums in dispute in this case. That album included three songs (Hater's Still Mad, We Ain't Scared, and 8 Rulez) that used the melodies authored by and the sound recording of those melodies owned by Maurice Jordan. *Appendix II, Exhibit 11, Sony BMG Copyright Certificate, First Publication, August 21, 2002; Exhibit 14, Tracks on Albums, Exhibit 15, Album Credits (Kenoe id'd for these three tracks), Exhibit 16, Album Sales per Annum (beginning 2002) and Cumulative.* Sales continue to be made for this album as recently as 2007-2008. *Id.*

16.     In August 2002, Sony BMG distributed a bonus CD in addition to the Undaground Legend album that included the song "Hater's Still Mad." That bonus album

9

included one song Hater's Still Mad in a "screwed" version that used the melody authored by

and the sound recording of that melody owned by Maurice Jordan. *Appendix II, Exhibit 11, Sony*

*BMG Copyright Certificate, First Publication, August 21, 2002; Exhibit 14, Tracks on Albums,*

*Exhibit 15, Album Credits (Kenoe id'd for this track), Exhibit 16, Album Sales per Annum*

*(beginning 2002) and Cumulative.* Sales continue to be made for this album as recently as 2007-

2008. *Id.*

17.     In 2005, Sony BMG distributed another album called "Lil' Flip and Suckafree

Presents: 713 and the Undaground Legend." That album included three songs (Hater's Still

Mad, We Ain't Scared, and 8 Rulez) that used melodies authored by and the sound recording of

those melodies owned by Maurice Jordan. *Appendix II, Exhibit 11, Sony BMG Copyright*

*Certificate, First Publication, August 21, 2002; Exhibit 14, Tracks on Albums, Exhibit 15, Album*

*Credits (Kenoe id'd for these three tracks), Exhibit 16, Album Sales per Annum (beginning 2002)*

*and Cumulative.* Sales continue to be made for this album as recently as 2007-2008. *Id.*

18.     Sony BMG has only paid certain music producers for their contribution to the

accused albums. One music producer, Edward Charles (pka "Kojak") was paid voluntarily by

Sony BMG over $137,000 for his contribution of one musical melody to the accused albums.

*Appendix II, Exhibit 17 (Edwards payment checks); Appendix III, Exhibit 30, Sony 30(b)(6)*

*Dep., Tr. 39:17-40:20.* Another music producer, Tommy Granville, was paid $167,500 by Sony

BMG after a Southern District of Texas jury found that there was willful copyright infringement

for one musical melody used on the *Undaground Legend* album. *Appendix II, Exhibit 18*

*(Granville payment); Appendix III, Exhibit 30, Sony 30(b)(6) Dep., Tr. 33:22-34:21.*

19.     Mr. Jordan is owed more than what these individuals were paid because he

contributed three melodies and sound recordings to two accused albums and a bonus CD, as

10

compared to the single melody contributions of these other producers. In 2002, Sony BMG paid Mr. Jordan a $3000 retainer against the additional amounts owed to him, which Sony BMG concedes in its briefing before this Court that this was just a "partial payment" for music contributions. This "initial" payment by Sony BMG is important for four reasons – one, Sony BMG agrees that there is no dispute that Mr. Jordan contributed the identified music to the accused albums, two, Sony BMG concedes that it is the responsible party for paying Mr. Jordan under the contracts with the other Defendants, three, Sony BMG concedes that additional money is owed to Mr. Jordan above and beyond this initial "retainer" payment, and four, Sony BMG concedes that Mr. Jordan is the person to whom royalties and fees for his contributions should be paid (as opposed to others).

20. Based on the sales volumes shown in Sony BMG documents and the average retail sales price of $11.98, Sony BMG has made revenues on the accused album sales of approximately $10 million. *Appendix II, Exhibit 16 (Sales per Annum), Exhibit 19 (retail price); Appendix III, Exhibit 30, Sony 30(b)(6) Dep., Tr. 21:1-18 (average retail price).* Sony BMG is reported to be the largest record company in the world having recent total revenues of over $4 billion dollars a year. *Appendix II, Exhibit 20, p.7 (Annual and Quaterly Statements); Exhibit 30, Sony BMG De., Tr. 31:11-32:6*

21. Despite distributing the subject Platinum-selling album entitled, *Undaground Legend,* Sony BMG has refused to pay all the producers, singing artist and local record company that created the album. Sony BMG's refusal to pay the producers, musicians, and the local record company, Suckafree Records, from the millions of dollars in revenue on this album has provoked a number of lawsuits, which resulted in a finding of willful copyright infringement by

11

a Southern District of Texas jury. *Appendix II, Exhibit 21, Jury Responses, Granville v. Sony BMG, et al, Civil Action No. 04-cv04002 (jury verdict, Jan. 20, 2006).*

### D. Communications and Tactics of Sony BMG

22.    Representatives of Sony BMG requested information on producer names and contact information for the first time on the release date of the first accused album. *Appendix III, Exhibit 22, Marquez Request, Aug. 21, 2002.* Obviously, releasing an album without this information is a risky proposition, but one that Sony BMG was compelled to do in order to get the album out on the market for the up-coming Christmas buying season. *Appendix III, Exhibit 30, Sony 30(b)(6)(Christmas buying season).* This request for information was quickly and repeatedly responded to by representatives of Suckafree and Mr. Jordan. *Appendix III, Exhibit 23, Responses.*

23.    Sony BMG's Copyright clearance reports and other Sony BMG documents, however, indicate that Mr. Jordan's songs were "cleared" and his royalty and licensing splits were "firm" as early as July 23, 2002 – several weeks before the Marquez request. *Appendix III, Exhibit 24 (tracks 3 and 8, "8 Rulez" and "Hater's Still Mad"); Chart ("8 Rulez", "Hater's Still Mad" and "We Ain't Scared" all confirm 50% mechanical royalty split for Mr. Jordan).* Sony BMG knew that there was no dispute regarding Mr. Jordan's royalties and splits throughout June 1, 2004. *Appendix III, Exhibit 25, Email Shovlowsky to Bauman, (cleared/firm splits of 50%, and asking why Sony BMG can't "just pay the n/c songs that aren't in dispute.")*

### 1. After Execution of the Contracts, The Plaintiff Requests for Information from Sony BMG

24.    As shown in the attached series of e-mails, Sony BMG was repeatedly asked about the status of the payment to the Plaintiff through his representatives. *See Appendix III, Exhibit 26, Emails dated, Oct. 1, 2003, p. 2 (final shares determined yet?), Jan. 6, 2004, p. 5*

("Any update?"), Jan. 14, 2006, p. 6 (request for update on mechanicals), Jan. 20, 2004, p. 8

(how much can look forward to), May 4, 2004, p. 10 ("Any update?" and Plaintiff's shares not

in dispute), May 26, 2004, p. 11 (please advise how we can settle matter, and no dispute on

Plaintiff's share of revenue), June 7, 2004, p. 12 (please advise on status), June 9, 2004, p. 14

(please advise on how much Plaintiff will receive).

> **2.     After Execution of the Contracts, Sony BMG Initially Promises to Pay Plaintiff for 50% Ownership Share**

25.     In response to these inquiries, Sony BMG <u>initially</u> states to the Plaintiff that

royalties were cleared and nothing should hold up the payments from Sony BMG under the

contracts at issue, as well as mechanical and other royalties that are also due. *See Appendix III,*

*Exhibit 26, Emails dated Sept. 16, 2003, p. 1 (Sony BMG admits that "M. Jordan in not only a*

*co-writer, but also a producer of the concerned songs" and preparing mechanical calculation),*

*Oct. 2, 2003, p. 3 (one Sony representative asks another Sony representative to update Plaintiff*

*on "the latest splits" and Plaintiff's "shares on this album"), Oct. 3, 2003, p. 4 (send me fax*

*number, will send shares table, which 50% share is doubtful to be challenged).*

> **3.     Then, Sony BMG Claims, For the First Time, Discrepancies Exist in the Accounting of Shares**

26.     Then, after two years of correspondence and after Sony BMG knew that there was

no dispute as to Mr. Jordan's splits of royalties and fees, Sony indicated <u>for the first time</u> that

there are undisclosed "discrepancies" that have to be worked out with co-Defendant Suckafree

Records and other third parties. *Appendix III, Exhibit 26, Jan. 14, 2004, p. 7 (discrepancies*

*surrounding this project, but anticipate including payment to Plaintiff in 1Q04 acct'g), Jan. 21,*

*2004, p. 9 (awaiting notification from Suckafree), June 7, 2004, p. 13 (Sony BMG preparing*

*calculation of how much it would pay Plaintiff).* Sony BMG has never indicated that there was

13

any discrepancy in the splits or royalties that were attributed to Mr. Jordan for his contribution --
it claimed discrepancies related to others caused a problem with paying Mr. Jordan.

> **4.    Then, Sony BMG Reduces Plaintiff's Ownership Share from 50% to a "Zero Rate," and Refuses to Respond to Subsequent Communications**

27.    Two years after the release date of the Platinum-selling album, a Sony BMG
representative indicates <u>for the first time</u> that the Plaintiff's ownership share has been reduced to
"a zero rate" because of an alleged "album cap." *Appendix III, Exhibit 26, June 9, 2004, p. 15
(bad news).* The Plaintiff's representative correctly responded to the Sony BMG's "zero rate"
position by pointing out that there was no agreement involving the Plaintiff that was subject to a
"cap/controlled rate." *See Appendix III, Exhibit 26, Emails, June 9, 2004, p. 16.* No response
was received to this email, or four subsequent emails to Sony BMG went unanswered. *See
Appendix III, Exhibit 26, Emails, June 16, 2004, p. 17 (any news?), June 16, 2004, p. 18 (no
agreement received), June 25, 2004, p. 19, (no agreement received), Aug. 26, 2004, p. 20 (no
responses received).*

28.    Two years after the album release, Sony BMG notified Mr. Jordan on June 9,
2004 that his royalties and fees in the songs he contributed to the album would be reduced to
"zero," which for the first time repudiated prior representations that Sony BMG would recognize
his "unchallenged" 50% ownership interests to those songs.   Subsequent to that repudiation,
Sony BMG has also released another album with Mr. Jordan's compositions on it, without his
permission and without compensating him for that later release. Based on Sony BMG's conduct,
in association with the conduct of their co-Defendants, Mr. Jordan was left with no option but to
pursue this matter in the Courts, and this lawsuit was filed on May 16, 2006 – less than two years
after the actions of Sony BMG that constituted a repudiation and breach of its obligations.

### 5.    Sony BMG's Continued Stalling and Delay Tactics

29.    Sony BMG was notified that Mr. Jordan had retained new counsel by several emails or other communications. *See Appendix III, Exhibit 27, Emails mentioning new counsel.* Apparently knowing from prior communication that Mr. Jordan may file a lawsuit with its new legal representative, Sony BMG misdirected a $10,000 payment to a third party as part of a "scenario" to claim that part of Mr. Jordan's claims were already settled. *See Appendix III, Exhibit 28 (email mentioning "scenario"), Exhibit 30, Sony BMG Dep. Tr. 72:19-74:2; 75:8-76:9; 118:1-7 ("scenario" related to paying third party money); Exhibit 29, Check to Koch.* This "scenario" to pay money to this third party (that no longer represented Mr. Jordan) was the brain-child of Sony BMG's in-house counsel. *See Appendix III, Exhibit 28 (email indicating "scenario" was suggestion of Mr. Salvo at Sony BMG).*

30.    After filing the present action, Sony BMG and the other Defendants requested arbitration of the claims in this matter. It is believed that Sony BMG orchestrated this arbitration request among the Defendants and spear-headed that effort to request arbitration.   That arbitration ended after many of the Defendants that had requested arbitration refused to pay for the arbitration or participate in the arbitration proceedings. After over a year delay, this Court vacated its arbitration order indicating that the case should proceed in this Court.

## III.    ARGUMENT AND AUTHORITIES

Sony BMG's Motion for Summary Judgment requests denial of every claim in the Plaintiff's Amended Complaint. Because genuine issues of material fact are disputed relating to these claims, Sony BMG's Motion for Summary Judgment should be denied. Fed. R. Civ. P. 56(c). General reference is made to Hobbs Declaration at Exhibit 4 and the Jordan Declaration at Exhibit 10.

15

**A.    Sony BMG Is A Responsible Party for Payment Under the Contracts.**

Counts I and II of the Complaint include claims for breach of contract, both express

contracts signed by the Plaintiff, as well as "other related contracts." *Amended Complaint, p. 9,*

*¶43, p. 11, ¶55.* Sony BMG contends that it possesses no contract liability in this action because

it never signed a contract obligating it to pay him any amount of money.

Under Texas law, a breach of contract requires the formation of a valid and enforceable

contract, either in writing or impliedly arising from the party's actions and conduct that indicate

a mutual intent to be bound to their respective obligations. *Railroad Mgmt. Co. v. CFS*

*Louisiana Midstream Co., 428 F.3d 214, 222 (5th Cir. 2005) (citing Haws & Garrett Gen.*

*Contractors, Inc. v. Gorbett Bros. Welding Co., Inc., 480 S.W.2d 607, 609 (Tex. 1972)).*

The Agency Agreement (Exhibit 1) between Suckafree Records and Sony BMG (as

incorporated into their Distribution Agreement) contains express contract language that makes

Sony BMG the agent of Suckafree Records and obligates Sony BMG to pay music producers and

copyright holders the fees and royalties owed to them. *Statement of Fact, supra., ¶1-3.* Mr.

Jordan, as well as others, were included in the scope of this contract obligation as the third party

beneficiaries of this payment obligation, and Sony BMG expressly acknowledged its position

under the contracts as the responsible party that would make the requested payments to these

beneficiaries -- on repeated occasions and as late as just a few weeks ago. *Statement of Fact,*

*supra., ¶1-3, 6-8, 18-19, 22-25.*

Suckafree Records and Mr. Weston entered into the Production Services Agreement with

Mr. Jordan, and Suckafree Records instructed Sony BMG to make complete payments to Mr.

Jordan pursuant to a Payment Authorization letter of instruction. *Statement of Fact, supra., ¶6-8.*

Pursuant to the instructions of Suckafree Records, Sony BMG, as an agent of Suckafree Records,

16

is contractually obligated to make the appropriate payments to Mr. Jordan. *Statement of Fact, supra., ¶1-3, 6-8.* Sony BMG acknowledged its contractual obligation initially when it paid Mr. Jordan the $3000 initial advance payment, but Sony BMG has refused to pay him any other royalties that are due and owing to him as a co-author and co-owner of three songs on the Platinum-selling album at issue. *Statement of Fact, supra., ¶19.* Instead, Sony BMG has taken extraordinary measures to reject any obligation to pay and avoid paying Mr. Jordan the proper amount of money – even though it has paid other producers hundreds of thousands of dollars for lesser contributions to the accused albums.

An implied contract arises from the acts and conduct of the parties, it being implied from the evidence of mutual intention to contract.. *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co., Inc.,* 480 S.W.2d 607, 609-10 (Tex. 1972). Broadly stated, any conduct of one party from which the other may reasonably draw the inference of a promises, is effective to establish an implied contract. *Id.* Sony BMG is also bound by an implied contract arising from its words and deeds with Mr. Jordan.

As set forth above, the Plaintiff, Mr. Jordan signed a Production Services Agreement that obligated the Defendants to pay a $3000 advance and additional royalties in exchange for Mr. Jordan's services. *Statement of Fact, supra., ¶6-8.* Mr. Weston, through his local record label, Suckafree Records, authorized Sony BMG to pay Mr. Jordan the advance as well as the subsequent royalties for these services. *Statement of Fact, supra., ¶1-3.*

Sony BMG was repeatedly asked about the status of the payment to the Plaintiff by his representatives. *Statement of Fact, supra., ¶24.* In response to these inquiries, Sony BMG initially promised to pay the Plaintiff royalties he was due as an "unchallenged" 50% owner and joint author. *Statement of Fact, supra., ¶25.* While Sony subsequently repudiated its promise to

17

pay the Plaintiff for his 50% ownership share in June 2004, the substance of its initial emails clearly indicates that Sony was obligating itself to make a payment of royalties to the Plaintiff – including royalties not covered in the scope of the written contracts. Before repudiating the claim of ownership in 2004, Sony BMG clearly and expressly indicated that it would be responsible for the payment of further royalties (some royalties not governed by the scope of the written contracts), exactly the way it had been responsible for the payment of the advance to the Plaintiff. *Statement of Fact, supra., ¶26-28.*

Given Sony BMG's voluntary assumption of the payment obligations and its agency relationship with Suckafree Records, there is little doubt that Sony BMG is a party to an implied contract with the Plaintiff. Other contract of law principles can also obligate Sony BMG under the assignment and delegation provisions of the Production Services Agreement, as well as the Distribution Agreement. But, because the Plaintiff reasonably drew the inference of a promise from Sony BMG's communications, and the Plaintiff relied upon those promises to his detriment, the breach of these implied obligations is also included in the "other related contracts" set forth in the Complaint. Sony BMG's Motion to Dismiss the Breach of Contract claims (Counts I and II) should be denied.

**B.     Sony BMG's Motion for Summary Judgment of No Copyright Infringement Should Be Denied**

The owner of a copyright can exclude others from copying the owner's copyrighted work during the term of his copyright. A copyright owner may enforce the right to exclude others from copying the copyrighted work in a legal action such as this. *Stewart v. Abend,* 495 U.S. 207 (1990); 17 U.S.C. §§ 106, 501. The unauthorized use of this composition is copyright infringement, as confirmed by *Bridgeport Music, Inc. v. Dimension Films*, 383 F.3d 390 (6th Cir.

18

2004) (any use of a copyrighted work is an infringement), and *Bridgeport Music, Inc. v. Dimension Films, 410 F.2d 792 (6th Cir. 2005).*

Mr. Jordan registered the melody he created in the Copyright Registration No. PAu3-123-432 for the underlying melodies used on the accused songs, which covers only the sequence of notes – not the resulting sound recording for lyric/melody combination. This registration is a "PA" copyright registration, which does not claim to protect the sound recording rights to the final album. The claim for copyright infringement in the Amended Complaint relates to the above copyright registration and the unauthorized distribution of albums using this melody – not the copyright registration on the final sound recording.

Mr. Weston played no role in the creation or authorship of these notes or this melody. *See Appendix III, Exhibit 31, Weston Dep. Tr. 110-112, 113-114 (he came in with a CD, he said I made these melody "beats," and provided the melodies to Mr. Weston who used the pre-recorded melodies with his rap lyrics); 126:7-25 (all pre-recorded music provided to Mr. Weston).* As set forth in the Authorization of Payment (Exhibit 7, ¶1), Plaintiff Jordan "composed the musical tracks for these songs." *See Exhibit 7, Payment Authorization, ¶1, p. 1, (signed by Mr. Weston).* As such, Mr. Weston (the rapper) did not create or contribute anything to the underlying melody copyrighted by Plaintiff Howard, he is not a joint author of those melodies, he has never had any rights as a joint author to the copyrights covering the underlying sequence of notes (melody), and he is not capable of licensing any copyright rights to the underlying melody to anyone, including Sony BMG).

Plaintiff Jordan is the sole author and creator of that melody, and the sole owner of the copyright rights to that melody – which have not been transferred or assigned to Sony BMG in any manner. Any alleged license from Mr. Weston to Sony BMG would not have included any

19

copyright rights to the underlying melody because Mr. Weston was not a joint author of those copyright rights. The Sony BMG licensing defense as to the copyright registration covering the underlying melody fails for these reasons.

Sony BMG was not authorized or licensed by Plaintiff Jordan to use the copyrighted melody, and that is copyright infringement. *Bridgeport Music, Inc. v. Dimension Films*, 383 F.3d 390 (6th Cir. 2004) (any use of a copyrighted work is an infringement), and *Bridgeport Music, Inc. v. Dimension Films, 410 F.2d 792 (6th Cir. 2005)*. The plaintiff may proceed in both contract and copyright simultaneously, not merely in the alternative. *Costello Pub. Co. v. Rotelle,* 670 F.2d 1035, 1043 (D.C. 1981); *see also, Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926, 932-933 (2nd Cir. 1992).

With respect to the statute of limitations defense asserted by Sony BMG, the controlling Fifth Circuit law recognizes that acts of copyright infringement committed within the last three years are outside the scope of the limitations period set forth in the Copyright Act. *Makedwde Pub. Co. v. Johnson,* 37 F.3d 180, 182 (5th Cir. 1994) (Copyright Act assigns liability for acts of copyright infringement occurring within the last three years); *see also, Bridgeport Music, Inc. v. Rhyme Syndicate Music,* 376 F.3d 615, 621 (6th Cir. 2004) (no statute of limitations defense for sales within last three years). Sony BMG's own briefing cites only unpublished precedent to support their new theory that the Copyright Act statute of limitations should be analyzed differently. This novel theory should not be adopted by this Court on this summary judgment determination. Because Sony BMG documents show sales of the accused albums within the last three years, there is no statute of limitations defense that would bar all claims to relief. *Statement of Fact, supra., ¶15-17, 20.*

20

Further, disputed issues of fact exist as to whether the doctrine of equitable estoppel should preclude all application of the Statute of Limitations set forth in the Copyright Act. Under the equitable tolling doctrine, a statute of limitations does not run against a plaintiff who is justifiably ignorant of his cause of action. *See Weber v. Geffen Records, Inc.,* 63 F.Supp.2d 458, 466-467 (S.D.N.Y. 1999); *Zupano v. Quinn,* 2006 N.Y. Lexis 196, *6 (Ct. App. N. Y. Feb. 21, 2006); *Herald Square Music Co. v. Living Music, Inc.,* 1978 U.S. Dist. Lexis 14050, *4 (S.D.N.Y. 1978).

In the present case, the Plaintiff actively pursued the matter with Sony BMG. In response to the Plaintiff's inquiries, the Defendant Sony BMG's indicated that there was no challenge to the Plaintiff's rights and the Plaintiff would be paid by Sony BMG. Those indications, combined with their initial recognition of ownership on the album cover, lulled the Plaintiff into believing there was no need to commence the present litigation upon the album release date.

It would be unjust to allow Sony BMG to make its lulling assurances to the Plaintiff so to delay the institution of this action, and then allow Sony BMG to assert a statute of limitations defense to curtail their damage exposure. As such, based on the facts presented herein, the statute of limitations period should be equitably tolled in light of the Defendant Sony BMG's actions and representations to the Plaintiff. For the foregoing reasons, there are disputed facts that the jury should decide as to whether the statute of limitations period should be applied or equitably tolled against Sony BMG. Sony BMG's request that this Court, as a matter of law, decide these disputed fact issues against the Plaintiff and limit damages as a matter of law should be denied.

21

C.    **The Copyright Ownership and Accounting Requests Should Not Be Dismissed.**

Contrary to Sony BMG's Motion for Summary Judgment, the Plaintiff's claim for an

joint authorship/ownership declaration and an accounting against Sony BMG are proper under

the law.  At the very least, there are genuine issues of material fact in dispute as to these claims.

1.    **Plaintiff Jordan and Sony BMG are Joint Owners of the Final Songs Distributed from the Master Recordings**

In the Amended Complaint, Plaintiff Jordan requests that he be adjudged a joint owner of

the final sound recordings found on the Master Recordings, which differ from the copyright

rights to the underlying melody addressed above.  These sound recording rights relate to the

actual sound recordings distributed and released to the public.  Plaintiff Jordan requests that

Sony BMG account to him for those joint ownership rights to the recordings sold in the market.

Mr. Jordan contributed "pre-recorded" melodies to the final recordings, and there is no

dispute that he created those recordings.  *Statement of Fact, supra., ¶12-17; Appendix III, Exhibit*

*31, Weston Dep. Tr. 110-112, 113-114 (he came in with a CD, he said I made these melody*

*"beats," and provided the melodies to Mr. Weston who used the pre-recorded melodies with his*

*rap lyrics); 126:7-25 (all pre-recorded music provided to Mr. Weston).*  As such, Mr. Jordan is

the joint owner of the sound recordings by virtue of his creation of the underlying music on the

sound recording distributed by Sony BMG.

As the foundation for their defense against this claim, Sony BMG argues that it is not a

joint owner (that needs to account to Mr. Jordan) because ownership rights were never assigned

to it.  The contract provisions cited above clearly undermine that position.  Mr. Weston, the

lyricist, assigned his rights to the lyrical content to Suckafree Records, which in turn assigned its

rights to the lyrical content to Sony BMG.  *Statement of Fact, supra., ¶9-11.*  As such, Mr.

22

Jordan is owner of the melody on the final sound recording, and by virtue of transfer and assignment, Sony BMG, is joint owner of the lyrical content on the final sound recording. These are not simply licenses, but the full assignment of rights possessed by the assignor to Sony BMG.

Sony BMG's own documents further contradict its position, and fully support the Plaintiff's claim of joint ownership and accounting. Sony BMG's registrations supplied to the Copyright Office records clearly indicate that Loud Records, LLC (a label of Sony BMG) is the "Claimant," which means the "owner" of the copyright right. *See Exhibit 11, Sony BMG Registration.* The Copyright Office records define the Claimant as follows:

> **The copyright claimant.** The copyright claimant is defined in Copyright Office regulations as either the author of the work or a person or organization that has obtained ownership of all the rights under the copyright initially belonging to the author. This category includes a person or organization who has obtained by contract the right to claim legal title to the copyright in an application for copyright registration.

See Exhibit 12, Copyright Office Regulations, p. 16 (emphasis added). It is clear that Sony BMG filed the necessary papers with the United States Copyright Office as the "claimant owner" of the copyright to the album at issue, and as such, Sony BMG is a properly named party to the claim for accounting as a co-owner.

Under the Copyright Act, a claim for an accounting properly lies with the owner and controller of the exploited work. Sony BMG should not be allowed to tell the United States Copyright Office that it is the owner of the final sound recording, and then tell this Court something entirely different. Because Sony BMG is a proper party to respond to the request for a declaration of joint ownership, Sony BMG's Motion for Summary Judgment on the Joint Ownership and Accounting issues should be denied.

**2.    No Statute of Limitations Prevents the Plaintiff from Seeking an Adjudication of Authorship and an Accounting**

As a last point of contention on the Copyright-related claims, Sony BMG contends that the claims for joint ownership and accounting are all time barred by the 3 year statute of limitations set forth in the Copyright Act.  Sony BMG's statute of limitations argument is misplaced.

**a.    Texas State Law Applies to the Accounting Claim**

First, there is a question as to whether a claim for an accounting under Texas State law is bound by the three year statute of limitations under the Copyright Act.  In *Goodman v. Lee,* the Fifth Circuit Court of Appeals directly addressed this issue finding that the three year statute of limitations period in the Copyright Act does not apply to "an action by a co-owner for an accounting." *Goodman v. Lee,* 78 F.3d 1007, 1013 (5th Cir. 1996) (applying the Louisiana state prescriptive period of ten years).

Under Texas State law, the statute of limitations period is governed by Tex. Civ. Prac. & Rem. Code § 16.051, which is four years from the day the cause of action accrues.  Because the cause of action accrued with the repudiation of the ownership interest by Sony BMG (June 2004 e-mail, ownership interest is "zero"), the present action (filed May 16, 2006) for accounting is timely filed by the Plaintiff under the four years statute of limitations applicable to this cause of action.

**b.    The Cause of Action Accrued on June 9, 2004, with the Repudiation of Ownership by Sony BMG**

Even if the three year period from the Copyright Act is applied, the cause of action did not arise until June 9, 2004 when the ownership interest dispute first arose in an email from Sony BMG. *See Appendix III, Exhibit 26, p. 15, Email June 9, 2004 (sorry, bad news, your share*

*reduced to a "zero" rate).* Thus, the starting point for any limitations analysis is to fix the date on which the cause of action accrued. In the instant case, the Plaintiff was told that he possessed an "unchallenged" 50% ownership right to the songs at issue for two years after the album release -- until June 9, 2004, when he was informed for the first time that Sony BMG had some "bad news" for him. *Statement of Fact, supra., ¶22-28.* Prior to that date, Sony BMG and the other Defendants acknowledged the Plaintiff's ownership interest, and it was only upon that date that there was an ownership dispute that arose.

In this situation, courts have adopted a series of tests to determine when a cause of action claiming co-ownership of a copyright accrues. As set forth by the Sixth and Ninth Circuit Courts of Appeal in similar situations, "the statutory period for any action to establish [copyright] ownership begins to run whenever there is a 'plain and express repudiation' of ownership by one party as against another." *Richie v. Williams,* 395 F. 3d 283, 289 n. 5 (6th Cir. 2005)(*citing Aalmuhammed v. Lee,* 202 F. 3d 1227, 1230-31 (9th Cir. 2000); *Zuill v. Shanahan,* 80 F.3d 1366, 1369 (9th Cir. 1996)). "Repudiation" includes activities such as "to disown," "to refuse to accept," "to refuse to acknowledge or pay." *Diamond v. Gillis,* 357 F. Supp. 1003, 1007 (E.D. Mich. 2005).

When the album was released, Mr. Jordan's ownership and contributions were duly noted on the album credits. *Appendix II, Exhibit 15, Album Credits.* At the time of the album release, there was no ownership dispute – so Sony BMG's insistence that the album release date be used to fix the statute of limitations period makes no sense.

The express repudiation in *Zuill* was the presentation of a contract to the Plaintiff that indicated he had no ownership interest in the work, and the Ninth Circuit found that the presentation of such a document was sufficient to have the ownership claim accrue. As set forth

25

therein, the Ninth Circuit held that "Mr. Shanahan's plain and express repudiation in 1986 and

1987 of any claim to co-ownership caused Mr. Zuill's and Mr. Rossi's action, if any, to accrue, so

the district court properly found the action to be barred by the statute of limitations." *Id.* The

first such communication to the Plaintiff in the present case occurred on June 9, 2004 with the

Honora Bauman email. *Appendix III, Exhibit 26, p. 15.*

In the *Ritchie* case, the defendants were presented with formal letters that disavowed and

disputed their ownership claim. The Sixth Circuit Court of Appeals found that such an action

would cause a co-ownership action to accrue. As described in *Miller Music v. Sony/ATV*

*Publishing,* 477 F.3d 383, 390 (6th Cir. 2007), the Sixth Circuit stated as follows:

> In *Ritchie,* the defendant's ownership claim was untimely because the plaintiff,
> Robert Ritchie, also known as Kid Rock, had expressly told the defendants, in a letter,
> that he had exclusive ownership of the songs he had written. 395 F.3d at 288.
> Specifically, the *Ritchie* Court noted that Kid Rock's letter "made it clear that he regarded
> the songs he had written as his songs" and subsequently "claimed exclusive ownership"
> of the rights to those songs. *Id.* Accordingly, we concluded that Kid Rock's letter
> constituted a plain and express repudiation of defendant's ownership claim and started the
> three-year-statute-of-limitations period.

*Id. at 390.* An express repudiation has also been found where an artist work is published without

appropriate credit being given to the putative co-owner of the final copyrighted work.

*Aalmuhammed v. Lee,* 202 F.3d 1227, 1231 (9th Cir. 2000) (credit as "Islamic Technical

Consultant," as opposed to co-creator, co-writer, or co-director, was sufficient to notify the

Plaintiff of the ownership dispute). Again, the first such communication to the Plaintiff in the

present case occurred on June 9, 2004 with the Honora Bauman email. *Appendix III, Exhibit 26,*

*p. 15.*

As such, express repudiations have been found to occur when contacts were made by

another that raised an ownership dispute. As shown in the evidence, the album was released <u>with</u>

co-ownership credits to Plaintiff Jordan (p/k/a "Kenoe"), agreements were reached with Mr.

26

Jordan dated 2002 confirming the ownership interest to Plaintiff Howard, and communications were sent for the two years after the album release confirming the ownership interest to the Plaintiff. No express repudiation occurred until June 9, 2004, when an email was finally sent to the Plaintiff indicating, for the first time, that he no longer had an ownership interest.

The cause of action for a declaration of co-authorship and co-ownership did not accrue prior to June 9, 2004. It was only on June 9, 2004 that Sony BMG took the position, for the first time, that the Plaintiff did not have an ownership interest in the subject album and Sony BMG refused to pay him any royalties due and owing to him. That is the repudiation date, which is the date the cause of action accrued. Because that date (June 9, 2004) is within three years of the filing date of this Complaint (May 16, 2006), the three year statute of limitations period under the Copyright Act does not preclude the copyright-related causes of action. At the very least, there are genuine issues of material fact in dispute as to when the cause of action accrued and whether the statute of limitations period has expired.

**D.     The Plaintiff's Fraud and Negligent Misrepresentation Claims Should Not Be Dismissed.**

By its motion, Sony BMG claims that it has never made any false promises to the Plaintiff because Sony always had the intention of performing the future act. Altogether, Sony BMG claims that: (1) it never misrepresented a factual matter, (2) its promises to pay cannot form the basis of fraud or negligent misrepresentation, and (3) its "partial performance" of the payment promises negates a key element in the fraud claim.

As shown in the communications from Sony BMG, Sony BMG was repeatedly asked about the status of the payment to the Plaintiff by his representatives after the execution of the contract between the Producer (Plaintiff) and the Artist. *See Statement of Fact, supra., ¶22-24.* In response to these inquiries, Sony BMG initially promised to pay the Plaintiff royalties he was

27

due as an "unchallenged" 50% owner and joint author. *See Statement of Fact, supra., ¶25.* After months of correspondence and Sony BMG's transmission of a Table with "unchallenged" royalty splits showing a 50% ownership interest for the Plaintiff, Sony then claimed there were undisclosed "discrepancies" that had to be resolved. *See Statement of Fact, supra., ¶26.* Then, without further explanation, Sony BMG notified the Plaintiff for the first time on June 9, 2004 that it was would be reducing the Plaintiff's ownership share to a "zero rate," effectively repudiating any prior acknowledgement of ownership by the Plaintiff to his contributions to the album. *See Statement of Fact, supra., ¶27-28.* Sony BMG then refused respond to communications from the Plaintiff's representatives that it was improper to reduce this share in this manner. *See Id at 28.*

Under Texas law, a fraud claim includes the following elements:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Coffel v. Stryker Corp.*, 284 F.3d 625, 631 (5th Cir. 2002) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47, 41 Tex. Sup. Ct. J. 289 (Tex. 1998)). As set forth in the Complaint, the Plaintiff's claim of fraud against Defendant Sony BMG is based upon a pattern of fraud occurring <u>after</u> the execution of the contracts and the initial advance payment to the Plaintiff.

Sony BMG's pattern of fraud includes the following:  (1) Sony BMG's confirmation of the Plaintiff's 50% ownership interest, including their representation that it was "unchallenged," (2) Sony BMG assurance to pay the Plaintiff all royalties that were due and owing to him as a joint author/owner, (3) the subsequent representations that alleged "discrepancies" arose over ownership rights, (4) their reduction of the ownership interest to a "zero rate," (5) Sony BMG's

28

refusal to pay any further royalties to the Plaintiff for his contribution to the Platinum-selling album, and (6) their refusal to respond to subsequent follow-up communications and requests for information from Plaintiff's counsel. One or more of the above-identified representations was false when made, and constituted a statement made with fraudulent intent. *See Exhibit 4, Hobbs Decl. ¶11-14, p. 3; See Exhibit 10, Jordan Decl., ¶6-11, p. 3-5.*

These statements, representations, and actions from Sony BMG constitute a pattern of conduct that was relied upon by the Plaintiff, and Sony BMG's subsequent false representations of alleged ownership "discrepancies" and a "zero" rate are currently being relied upon by Sony BMG and the co-Defendants to refuse payment to the Plaintiff, which has caused damage and injury to the Plaintiff. *Id.* While Sony BMG's Motion for Summary Judgment focuses exclusively on the contracts at issue or the initial payment of an advance against royalties, Sony BMG's fraudulent conduct (supporting both fraud and negligent misrepresentation) is based primarily on their subsequent interaction with the Plaintiff and others – which have supported its claim for a Statute of Limitations defense and a reduction in the damage amount. Accordingly, the Motion for Summary Judgment as to the Plaintiff's Claims of fraud and negligent misrepresentation should be denied.

### E. The Plaintiff's Texas Theft Liability Act Claims Are Not Preempted By The Copyright Act.

Count VII of the Complaint asserts a claim under the Texas Theft Liability Act for the unlawful acquisition of the Plaintiff's production services by the Defendants. This claim is directed to the acquisition of the Plaintiff's production services without proper compensation, which is distinguishable from the copyrightable content that is protected under the Copyright Act. *See Exhibit 10, Jordan Decl., ¶11, p.5.* The Copyright Act protects the content and substance of works of authorship after creation -- the Copyright Act does not protect pre-creation

29

production services. As such, the claims under the Texas Theft Liability Act are not preempted by the Copyright Act.

Federal copyright law preempts state law claims only if the state law protects specifically enumerated rights already protected by Federal Copyright Law. *17 U.S.C. § 301*; *Daboub v Gibbons*, 42 F.3d 285 (5th Cir. 1995). 17 U.S.C. §301 sets forth two conditions, which must be satisfied for federal preemption to arise: (1) the work in which the right is asserted must come within the subject matter of copyright as defined in sections 102 and 103, (2) the right the party seeks to protect must be equivalent to any of the exclusive rights within the general scope of copyright as specified by 17 U.S.C. §106. *Alcatel USA, Inc. v. DGI Techs., Inc.,* 166 F.3d 772 (5th Cir. 1999); 17 U.S.C. § 301.

Under the first prong of this analysis, the Copyright Act states that the specifically enumerated rights protected by the Act are directed to protecting the works of authorship after creation, not to protecting production services hired prior to creation of an artistic work. 17 U.S.C. §106. A state law claim is not preempted if the state law requires an "extra element" instead of or in addition to the acts enumerated in 17 U.S.C. §106. *Direct TV Inc. v. Cantu*, 2004 U.S. Dist. LEXIS 22715 (W.D. Tex. 2004). In particular, state law claims are not preempted if the "extra element" changes the nature of the action so that it is qualitatively different from the copyright infringement claim. *Id.* To determine whether a claim includes extra elements, courts should ascertain what rights the plaintiff seeks to protect and what theories the plaintiff relies upon for protection. *Id.*

As discussed above, the Plaintiff is alleging theft of production services under the Texas Theft Liability Act. This claim is not a copyright claim couched in State law terms – in fact, this claim does not even remotely touch upon the rights covered by the Federal Copyright Act. The

Plaintiff's claim under the Theft Liability Act is based on the Plaintiff being a service provider, the Defendant unlawfully appropriating, securing or stealing the Plaintiff's services, the Defendants' having an intention to avoid payment for the service, and the Plaintiff sustaining damages as a result of the theft. Tex. Civ. Prac. & Rem. Code §§134.001-005. Each of these claims requires an "additional element" of proof apart from the proofs for copyright infringement, which necessarily negates the Defendants' preemption argument. Under the "extra element" test defined in *DirecTV,* the Plaintiff's claims are not preempted by the Federal Copyright law.

Because the Plaintiff's Texas State law claims are not covered by the protections afforded under the Copyright Act, either literally or equivalently, the Plaintiff's claims under the Theft Liability Act are not preempted by the Copyright Act. *Kane v. NACE Int'l,* 117 F. Supp. 2d 592 (S.D. Tex. 2000) ([s]tate law causes of action that have been held not to be preempted by the Copyright Act include breach of confidentiality, breach of trust, unfair competition, and trade secret misappropriation) (*citing Harbor Software, Inc. v. Applied Systems, Inc.*, 887 F. Supp. 86, 89 (S.D.N.Y. 1995)). There are non-copyright related facts and arguments that support the Plaintiff's State law claim, and these additional elements necessarily negate the Defendants' preemption argument. Accordingly, the Defendants' motion to dismiss the Theft Liability Act should be denied. [1]

---

[1] Sony BMG also asserts a two-year Statute of limitations defense against this claim. For the same reasons set forth above, the Complaint was filed (May 2006) within the asserted two-year period after the theft of the production service arose with the repudiation of the ownership interest and the initial refusal by Sony BMG to pay the producer in June 2006.

31

## IV.   CONCLUSION

For the foregoing reasons, the Plaintiff asks that this Court deny Sony BMG's Motion for

Summary Judgment in all respects.


Dated: July 31, 2008                           Respectfully submitted,


                                               /s/ D. Scott Hemingway
                                               D. Scott Hemingway
                                               Attorney In Charge
                                               State Bar # 09407880
                                               Eugenia S. Hansen
                                               HEMINGWAY & HANSEN, LLP
                                               8117 Preston Road, Suite 460
                                               Dallas, Texas  75225
                                               Telephone:   (214) 292-8301
                                               Facsimile:    (214) 739-5209


32

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on all the following counsel of record in the manner indicated this 31st day of July, 2008.

*Via ECF-Pacer*

Geoffrey H. Bracken
Samantha Trahan
Gardere, LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002
Facsimile: 713/276-5555

Shane A. McClelland                                    *Via ECF-Pacer*
Herbert & McClelland, LLP
3701 Kirby Dr. Ste 845
Houston, Texas 77098
(713) 987-7110 (phone)
(713) 987-7113 (fax)

Ronald Cohen                                           *Via ECF-Pacer*
Cohen & Raymond
One Arena Place, Suite 2000
7322 Southwest Freeway
Houston, Texas 77074
Phone: (713) 981-4129
Facsimile: (713)

/s/ D. Baragan

33